**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES FOR AN ORDER AUTHORIZING THE MONITORING OF GLOBAL POSITIONING SYSTEM INFORMATION AND CELL SITE DATA FOR A SPRINT CELL PHONE WITH THE NUMBER 301-302-2774 | Mag. No.<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION FOR A SEARCH WARRANT**

I, Alvin Cardinal (hereinafter your affiant), Officer in the Metropolitan Police Department (MPD), Narcotics and Special Investigation Division (NSID), Major Case Unit (MCU), Washington, D.C. (WDC), having been duly sworn, state:

**INTRODUCTION**

1. I am presently involved in an investigation concerning individuals who distribute phencyclidine ("PCP") in the District of Columbia. I am seeking authorization to obtain information about the prospective location of the cellular telephone assigned call number 301-302-2774, with Electronic Serial Number ("ESN") 310120200096793 (the "Target Telephone"), whose service provider is Sprint, a wireless telephone service provider.

2. I am a member of the MPD with approximately thirteen years of service. During my tenure with MPD, I have assisted in the execution of approximately three hundred search warrants that resulted in the seizure of either illegal firearms and or illegal narcotics. Your affiant is currently assigned to the Narcotics and Special Investigation Division, Major Case Unit. Your affiant has attended courses on narcotics and firearms investigations, and has also attended months of intensive training at the Institute of Police Science in Blue Plains, Washington, D.C.

Based on my training and experience, I have learned that drug dealers frequently use cellular phones in order to conduct their business with prospective buyers and suppliers (via voice calls and text messages and other services available through the use of cellular phones), and that drug dealers often keep cellular phones on their person or nearby throughout the day.

3. As a result of my personal participation in this investigation, as well as through conversations with other members of the MPD and agents of the Federal Bureau of Investigation ("FBI") who are also working on this investigation, I am familiar with all aspects of this investigation. In this affidavit, I allege the facts to show there is probable cause to believe that violations of 21 United States Code §§ 841(a)(1) and 846, the distribution and possession with intent to distribute controlled substances and conspiracy to do the same, have been committed and are being committed by JAQUAN BEST aka "WOP" ("BEST"), and others known and unknown, and that information concerning the location of the Target Telephone will constitute or yield evidence of violations of the controlled substances laws (21 U.S.C. §§ 841 and 846) being committed by BEST and others, known and unknown. This evidence includes the location of stash houses for drugs and drug proceeds, and the identity of co-conspirators, associates, and suppliers. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant, and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

4. In March of 2014, your affiant and other members of MPD's Major Case Unit began investigating individuals in the District of Columbia who are selling illegal narcotics. The investigation revealed that subjects of the investigation have access to large quantities of PCP (Phencyclidine). MPD Undercover Officers have been able to purchase PCP from several individuals. The focus of this warrant is one of the individuals identified as BEST.

2

5.     In part through the use of a Confidential Informant (CI), an undercover officer ("undercover") arranged for the purchase of PCP, and on August 13, 2014, BEST arrived at a controlled location in Washington, D.C., in the company of another individual.  BEST entered the location carrying a bag which contained the PCP, and handed the bag to the other individual while taking a call on a cellular telephone that BEST brought with him into the location (not the Target Telephone).  During the ensuing conversation, BEST indicated that the price was $325, but the undercover ultimately paid $300 in currency for approximately one ounce of a substance that later field-tested positive for PCP.  During this encounter, BEST indicated that he could sell more PCP in the future.

6.     Subsequently, arrangements were made for further deliveries of PCP, and on three more occasions BEST arrived at a controlled location in Washington, D.C. (by himself) and sold PCP:  August 21, 2014, when he sold an undercover approximately five ounces of a substance that field-tested positive for PCP, in exchange for $1,650 in currency;  October 1, 2014, when he sold an undercover approximately 191.2 grams of a substance that field-tested positive for PCP, in exchange for $1,650 in currency; and February 2, 2015, when he sold an undercover officer approximately one ounce of a substance that field-tested positive for PCP, in exchange for $280 in currency.  Your affiant understands that BEST utilized one or more cellular telephones to arrange logistics for these transactions with the undercover.

7.     On June 10, 2015, BEST contacted the undercover utilizing the Target Telephone, and indicated that he had a good supply of PCP and was open to new sales.  Through subsequent and continued communication via the Target Telephone, BEST and the undercover made arrangements for a PCP deal.

8.     On June 12, 2014, BEST communicated with the undercover via text messaging

from the Target Telephone about his pending arrival. A little after 1:00 p.m., BEST entered a controlled location in Washington, D.C., and sold the undercover approximately two ounces of a substance that field-tested positive for PCP, in exchange for $540 in currency. During this encounter, BEST discussed potential prices for larger quantities of PCP and indicated he would contact his supplier to get more information about pricing.

9. Based on my investigation and training and experience, as well as the facts related above, I believe that there is probable cause to believe that the Target Telephone is frequently used by BEST to support his drug trafficking and that the Target Telephone remains on or near his person throughout most or all of the day.

10. Based on my training and experience, I know that drug traffickers maintain locations to stash their illegal narcotics, their drug proceeds and other evidence of their drug trafficking enterprise, such as scales to weigh illegal narcotics, cutting agents, wrapping material, bank records, and books and records reflecting drug proceeds, quantities of drugs acquired and distributed, and payments owed or due for drug acquisitions and distributions. Based on my training and experience, I know that evidence of the location of the Target Telephone, which BEST uses for drug trafficking, will assist law enforcement in identifying BEST's co-conspirators and suppliers and associates, and the stash houses and the locations of other evidence of his drug trafficking.

11. In my training and experience, I have learned that Sprint is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data,

also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

12. Based on my training and experience, I know that Sprint can collect E-911 Phase II data about the location of the Target Telephone, including by initiating a signal to determine the location of the Target Telephone on Sprint's network or with such other reference points as may be reasonably available. Based on my training and experience, I know that Sprint can collect cell-site data about the Target Telephone. The government is seeking E-911 Phase II data, also known as GPS data, as well as cell-site data where such data is not available.

## AUTHORIZATION REQUEST

13. Based on the foregoing, I request that the Court issue the proposed search warrant. I further request that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result. Providing immediate notice to the subscriber or user of the Target Telephone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person

an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.

14. I further request that the Court direct Sprint to disclose to the government any requested location information that is within the possession, custody, or control of Sprint for a period of 30 days during all times of day and night. I also request that the Court direct Sprint to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the requested location information unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the Target Telephone on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Telephone outside of daytime hours.

15. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation and public disclosure may cause targets to flee and to destroy evidence. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

## CONCLUSION

16. Your affiant asserts that the facts contained within this affidavit establish probable cause to believe that information, including cell site information and information obtained from E-911 tools, concerning the location of the cellular telephone presently assigned telephone number call number 301-302-2774, with Electronic Serial Number ("ESN") 310120200096793

(the "Target Telephone"), with cellular service provided by Sprint, will constitute or yield evidence of violations of the controlled substances laws (21 U.S.C. §§ 841, 846) being committed by BEST and others, known and unknown.

 I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

               _____
               Officer Alvin Cardinal
               Metropolitan Police Department

Sworn to and subscribed before me
this _____ day of July, 2015.

_____
The Honorable Deborah A. Robinson
Magistrate Judge for the District of Columbia